WINNIPISSEOGEE LAKE COTTON AND WOOLEN MANUFACTURING COM-
PANY v. JOHN L. PERLEY.*

Upon a written statement made between the parties, and where a deed of conveyance was made
and executed in pursuance of such agreement by the defendant to plaintiffs, founded upon
good consideration, containing the following special covenant, viz: "And the said Perley
does also hereby grant to said company in manner aforesaid the right to flow any lands
which he owns and which may be flowed or affected by said company keeping the water by
their dam at Union Bridge 20 inches higher than Eager rock, so called, near Meredith
Bridge, provided that said company shall not keep the water higher than said point, 20
inches above said Eager rock, whenever they can keep the same down to said point by re-
moving the flashboards from said dam and by opening their wasteway which shall be en-
larged to 60 feet:" *Held*, That plaintiffs' dam was to be regarded the regulator of the
water, and to control its heights at the Eager rock, subject to the enlargement of the waste-
way thereof, and the subseqnent reasonable use of the said wasteway, and the flashboards on
the dam. The deed of the parties is to be construed with reference to the actual state of the
dam with all its privileges and easements, enjoyed at the time of its execution, and subject
to the new uses applicable to it.
To show the *intent* of parties, their contemporaneous written agreements made between them,
at or near the time of the execution of the deed, relating to the same subject matter, are
admissible in evidence. Hence, where it was shown that the aforesaid 20 inches on the Eager
rock had been established as equivalent to 15 inches of water on the top of the permanent
part of plaintiffs' said dam, and at the time of the conveyance both parties had relied on a
table of admeasurements, made by a civil engineer, showing the aforesaid result, and that
such table had been adopted as the basis of their settlement and said conveyance, and that
under a later survey by another civil engineer, and other testimony, the former survey was
proved to be mistaken, and such mistake shown to be prejudicial to plaintiffs' rights: *Held*
That equity would relieve the plaintiffs from the consequences of such mistake, and would
so reform the deed of the parties, as to prevent wrong and suffering: *Held*, also in giving
a construction to said deed, so as to obtain the true intent of the parties thereto, the court
would look at the true situation of the parties at the time, and all the circumstances sur-
rounding the case, the subject matter and design of the deed, and all the general provisions
and expressions of the instrument, and, to remove doubt and ambiguity there found, will call
in the aid of parol extrinsic evidence; *also*, will look at the *acts* done under the deed or
contract, as giving a clue to the true intention of the parties.
After the court had reformed the deed of the parties, by their decree, so as to make it conform
to the original agreement or intent of the parties, and a suit at law having been previously
commenced by the defendant to test their respective rights, the court, as part of the decree,
removed the temporary injunction upon the defendant's suit at law, and allowed him to
proceed and prosecute it to final judgment.

BELKNAP, SS.—TO THE SUPREME JUDICIAL COURT.

*The Winnipisseogee Lake Cotton and Woolen Manufacturing
Company, a corporation existing by law in this State, and doing
business at Gilford in said county, complain against John L.
Perley, of Laconia, in said county, and say:*

THAT, on the thirtieth day of August, in the year 1852, they were,
and for a long time prior thereto, had been, the lawful owners in pos-
session of a tract of land situate in the towns of Gilmanton, (now Upper
Gilmanton,) and Sanbornton, in said county, at Union Bridge, so call-
ed, near the outlet of Sanbornton Bay, and bounded as follows, to wit:
Southerly by land of the defendant; westerly by the road leading from
the westerly end of the Burleigh bridge, so called, over the Winnipisse-
ogee river, to the westerly end of said Union Bridge, and northerly and

* This decision and the accompanying decree were made Dec. Term, 1863, (adjourned to
March, 1864.)                                                        REPORTER.

easterly by said Sanbornton Bay and the highway leading across said Union Bridge, containing 20 acres more or less, also a strip of land lying on each side of said river, and extending from the northerly end of the land above described to Sanbornton Bay, together with a certain dam, known as the Pearson dam, extending across the Winnipisseogee river on said land first described, and a sawmill on the easterly and a clapboard mill on the westerly side of said river, with all the water power, mill privileges and water rights on said river and the premises aforesaid, and the rights and easements appertaining thereto. And from time immemorial the plaintiffs and those under whom they hold, by means of dams across said river on said premises, and of flash-boards thereon, have kept up and maintained the water in Sanbornton Bay as high as the plaintiffs have kept up and maintained the same by means of their present dam and flash-boards on said premises. That said dam now standing on said premises, was constructed and filled with water in the autumn of 1828, from which time the plaintiffs and those under whom they hold, by means of flash-boards kept and maintained on the top or permanent part of said dam, have raised and maintained the water in Sanbornton Bay as high and no higher than aforesaid, to wit: Fifteen inches or more higher than the top or permanent part of said dam; and also, at the same time they were, and, for a long time prior to said thirtieth day of August, 1852, had been the lawful owners in possession of a water fall and mill privilege, called Folsom Fall and privilege, upon the Winnipisseogee river at Lake Village, so called, in Laconia and Gilford, in said county, and of the land at, near and around the same, and of the mills at said Fall, which are situate in said Laconia, on the northwesterly side of said river, and other mills in said Gilford, on the easterly side of said river, and the plaintiffs say that by means of their dams and wasteways at Lake Village and Union Bridge aforesaid, they and those under whom they hold, possessed and had always from time immemorial been accustomed to exercise the right of holding back and discharging the waters of Winnipisseogee Lake and of Sanbornton Bay to the extent which they have held back and discharged the same.

That, on and prior to said 30th day of August, 1852, the defendant was the owner of the Atkinson Falls, so called, on said river, situate about eighty rods southerly from said Pearson dam, and the mill, mill privilege, and lands adjoining and lying near the same on each side of said river, in said Sanbornton and Gilmanton, and also of a certain island in Little Bay, so called, below said falls, and of other lands lying upon and adjoining said Sanbornton Bay and said river, situate in said towns of Upper Gilmanton, Sanbornton, Laconia and Meredith, in said county, being the lands described in the writs, copies of which are annexed marked " D " and " H," and at the dates thereof, then being the owner of the premises aforesaid, brought his said actions against the plaintiffs, for alleged wrongful flowage of his lands aforesaid, by means of the plaintiffs' said Pearson dam, and flash-boards thereon, which said actions were entered in said court at the terms in said writs mentioned, and that at the same time other suits were pending in said court against these plaintiffs, in favor of sundry owners of land and mill privileges on

said river in said towns of Gilford and Laconia, on account of the waters in Sanbornton Bay as held and used by these plaintiffs, by means of said dam and flash-boards, and of holding back and discharging the waters of said lake by means of the plaintiffs' said dam and wasteways at Lake Village, and over their dam at Laconia, then called Meredith Bridge, known as the Avery dam, and land below on said river and bay.

And the plaintiffs say that, during the time said actions were pending in said court, for the purpose of ending and avoiding all further complaints and litigation, and that they might enjoy the rights, privileges and easements which they had heretofore claimed, exercised and enjoyed, touching and concerning their said water powers, mill privileges, water rights and wasteways at Lake Village and Union Bridge aforesaid, free from all complaints and molestations, as well on the part of this defendant, as of said mill and land owners at and near the Avery dam aforesaid, they entered into negotiations with said litigants, for a full, complete and final adjustment of all their suits and complaints aforesaid, among other things, for the same right as to each of them, of holding back and discharging waters from the plaintiffs' reservoirs above Lake Village, and of holding and discharging waters in and from said Sanbornton Bay, and about the first time above mentioned, to wit, on the twenty-fifth day of September, 1852, they so agreed with said mill and land owners at and near said Avery dam, and settled and adjusted their said suits and complaints, that is to say, said mill and land owners agreed to the rights, privileges and easements claimed by the plaintiffs as aforesaid, of holding back and discharging water by means of said dam and wasteways at Lake Village aforesaid, and of keeping up and maintaining the water below in Sanbornton Bay, by means of said Pearson dam and flash-boards thereon, fifteen inches higher than the top or permanent part of said dam, and discharging the water into and from said bay, as the plaintiffs above had claimed and exercised the right to do, provided these plaintiffs should not keep the water in said bay, higher than said point, fifteen inches above the top or permanent part of said Pearson dam, whenever they could keep the same down to said point by removing the flash-boards from said dam, and by opening the wasteway therein, which was to be enlarged to the extent of sixty feet, as will appear by a copy annexed, marked "B."

And the plaintiffs say that, on said thirtieth day of August, 1852, by their agent, the said James Bell, they made and concluded sundry agreements, in writing, with the defendant as will appear by a copy thereof, which is annexed, marked "A," whereby, among other stipulations, in consideration of the large sums of money by these plaintiffs paid to the defendant, and of the covenants and other agreements by said plaintiffs to be performed, as by said agreement in writing will appear, the defendant thereby agreed, as was then understood, expected and believed by each of said parties, to release and quitclaim unto the plaintiffs, their successors and assigns, with a release of the right of dower, the right to hold the waters in said Sanbornton Bay, on and by means of their said dam at Union Bridge, fifteen inches higher than the top or permanent part of said dam, provided the plaintiffs should not

hold said waters higher whenever they should be able to keep said waters down to said point by removing the flash-boards from said dam and by opening the wasteway therein, which was to be enlarged to the extent of sixty feet, and also the right to hold back and discharge waters from their reservoirs above, and from said Pearson dam, as they should have occasion, subject to the limitation aforesaid. The plaintiffs further say that Eager Rock is ·situate at the mouth of the Winnipisseogee river, on the easterly side of Sanbornton Bay, near the village formerly called Meredith Bridge, five inches, or nearly so, below the level of the top or permanent part of said Pearson dam, and that, in making and concluding said agreements and stipulations, said parties understood, expected and believed, then so understanding the level of said objects, that twenty inches of water on said rock, in the management and regulation of the waters of said bay, would at all times be equal to fifteen inches on the top or permanent part of said dam, their relative height being as aforesaid, and when said writings were about to be executed, it was suggested by the defendant that, instead of following the terms of their agreement relative to keeping the·:water at said Pearson dam fifteen inches higher than the permanent part thereof as aforesaid, the right thus bargained and paid for, as herein stated, should be conveyed by reference to a more permanent monument than said Pearson dam, and that conveying the right to keep the water twenty inches over said Eager rock, would convey the same right as if the description was of the right to keep the water fifteen inches on said dam. And thereupon, and for the reason and upon the understanding aforesaid, and for and upon none other, the erasure and interlineation now appearing in the original paper in writing, a copy of which marked " B " is hereto annexed, were made, if made at any time with the knowledge and consent of the said Bell, or of any other person as agent for said company. And the plaintiffs say that, after said agreements and stipulations were made and entered into as aforesaid, and before the making and delivery of the deed hereinafter mentioned, by the defendant to the plaintiffs, and in pursuance thereof as understood, expected and believed by said parties, the plaintiffs by their agent, the said James Bell, made or caused to be made and placed upon the top or permanent part of said Pearson dam, flash-boards of the uniform width of fifteen inches higher than the top or permanent part of said dam, and constructed said additional wasteway therein as provided in said agreements and for the purpose therein specified, and so thereafter peaceably used, exercised and enjoyed said rights and privileges at said Pearson dam, and at said dam and raceways at Lake Village aforesaid, until the making and delivery of the deed by the defendant to the plaintiffs, hereafter set forth.

And the plaintiffs further say that, on the twenty-sixth day of September, 1852, the defendant made, executed and delivered to the said James Bell, agent as aforesaid, his said deed of release and quitclaim, a copy of which is annexed, marked " E," releasing and quitclaiming unto them, their successors and assigns, among other things as was then understood, expected and believed by each of said parties, the rights, privileges and easements touching and concerning said waters, dam and flash-

boards at Union Bridge aforesaid, and holding back and discharging waters from the plaintiffs' reservoirs above, and over and through said Pearson dam as hereinbefore set forth, for which and other conveyances, as in said deed will appear, the plaintiffs paid and delivered to the defendant said large sum of money, with interest, and the other and further considerations in said agreements in writing mentioned ; whereupon all suits for any and all causes aforesaid, of the defendants against the plaintiffs then pending as aforesaid, were discontinued.

And the plaintiffs further say that, after the execution and delivery of said deed from the defendant to the plaintiffs, they continued in the peaceable and uninterrupted exercise and enjoyment of all the rights and privileges at Union Bridge and Lake Village aforesaid, and concerning the management and regulation of the waters of said lake, river and bay, as above set forth and understood, expected and believed by said parties to have been released and quitclaimed by the defendant to the plaintiffs as aforesaid, holding the water fifteen inches on said Pearson dam, and not higher, and holding back and discharging the same as they had occasion, without complaint or molestation on the part of the defendant, or of any other person, that came to the knowledge of these plaintiffs, not only to the time of the death of their said agent, James Bell, but down to the time of the defendant's suit below mentioned, and these plaintiffs never understood and had no expectation or belief, nor did it come to their knowledge, that the agreements and conveyance aforesaid contained any less grants, rights, privileges and easements than those they had exercised and enjoyed as above set forth, from the dates thereof, until a long time after the bringing of the defendant's said suit.

And the plaintiffs say that they were induced to pay, and did pay, the large sums of money, and other considerations in said writings stipulated by them to be paid, chiefly and mainly, for the right peaceably and quietly to hold the water by and on said Pearson dam, fifteen inches higher than the permanent part thereof, according to the provisions of said agreements in writing, as was by said parties then understood, expected and believed as aforesaid, and that they had no thought or expectation of receiving, and never agreed nor consented to receive from the defendant, for the large consideration before mentioned, nor for any other consideration, the right to hold said waters twenty inches above said Eager Rock, except upon the understanding, expectation and belief aforesaid, that twenty inches of water on Eager Rock would at all times be equal, in the use, management and regulation of the water in said bay, to fifteen inches of water on the top or permanent part of said Pearson dam ; whereas in fact, that in all times and seasons of high water in said bay, in the use and regulation thereof, with said flashboards removed from said dam and the wasteway therein opened to the extent of sixty feet, as provided in said agreements in writing, for such times and seasons, twenty inches of water on said Eager Rock will make but four and one-fourth inches of water on the top or permanent part of said Pearson dam, and that fifteen inches of water on the top or permanent part of said dam in such times and seasons of high water in said

bay with the flash-boards removed and said raceway opened as aforesaid, will make thirty-five inches of water on said Eager Rock, contrary to all understanding, expectation or belief of said parties in making said agreements in writing, and in the execution and delivery of said deed and the acceptance thereof by the plaintiffs, said writing now presented by the defendant and hereunto annexed, marked " B," having been altered and changed, if altered and changed with the knowledge and consent of the said Bell, at the request of the defendant for the reasons before stated, each of said parties understanding and believing that the conveyances provided to be made in said paper marked " B " would be the same as before set forth, as those provided in said other agreements in writing annexed, marked " A," and that in the varying stages of the water in said bay and river, there is such continual fluctuation between the relative height of the water at said Pearson dam and said Eager Rock, that it is impracticable, by the use of said dam to regulate the height of the water upon said rock according to the terms, so by mistake and misunderstanding inserted in said deed ; and said rock, moreover, being situate twelve rods from the shore, and five miles and upwards from said dam, also renders it impracticable to ascertain at the dam, in the fluctuations of said water, at what height the water stands upon said rock, and so the change of guage or water mark as aforesaid, from said permanent part of said dam, to said Eager Rock, perverts and defeats the settlement hereinbefore set forth by the plaintiffs and defendant intended to be made, deprives the plaintiffs of all benefit and advantage from the large sum of money and other considerations as aforesaid, by them paid and delivered to the defendant, and also of the large sums of money and other considerations by the plaintiffs paid and delivered to said mill and land owners at and near the Avery dam aforesaid, for the peaceful exercise and enjoyment of the same rights and privilege to hold and maintain said waters on said Pearson dam fifteen inches higher than the top or permanent part of the same, to hold back and discharge water from the plaintiffs' reservoirs above, and over and through said Pearson dam as they shall have occasion, subject only to the limitation aforesaid of removing the flash-boards from said Pearson dam and of taking up the raceway therein as above provided at all times and seasons of higher water than said fifteen inches on said Pearson dam, and renders wholly worthless and of no value to the plaintiffs the rights, privileges and easements in and upon the defendant's said lands lying upon the shores of said bay and river as in said agreements in writing, and said deed, was by the parties understood, expected and believed to be released and quitclaimed.

Yet the defendant notwithstanding said mistakes, errors and misapprehensions of said parties in the premises aforesaid and the large and abundant consideration in money and other things received by him of the plaintiffs for the release and quitclaim by him to the plaintiffs, their successors and assigns, of the rights, privileges and easements aforesaid, understood, expected and believed by said parties to have been bargained and by the defendant released and quitclaimed as aforesaid, and by reason whereof the plaintiffs ought now to be in full, free and uninterrupted

use and enjoyment of all the rights, privileges and easements in and upon the shores of said bay and river, in accordance with the understanding, expectation and belief of the parties as aforesaid, has commenced, and has now pending in the Supreme Judicial Court in said county, a suit against the plaintiffs for damage to his said lands, lying upon the shores of said bay and river, as aforesaid, wrongfully caused, as it is pretended, by holding the waters of said bay and river, by means of said dam and flash-boards at Union Bridge, more than twenty inches above said Eager Rock; and for holding back and discharging the water from said reservoirs above, as by the copy of the writ in his said action hereunto annexed will appear, and so by means of said suit at law the defendant is wrongfully and unjustly contriving and intending to deprive the plaintiffs of all gain, benefit and advantage concerning the rights, privileges and easements aforesaid, in and upon the defendant's said lands, lying upon the shore of said bay and river, and of the large sum of money and other considerations aforesaid, by him, of the plaintiffs received therefor.

And the plaintiffs further say that when they became aware, and were informed, of said error and mistake in said deed, they requested the defendant, to wit, on the 6th day of September, 1861, to correct said error and mistake, and to release and quitclaim to the plaintiffs, with a release of the right of dower, the rights, privileges and easements hereinbefore first set forth and described, as in said agreement in writing is contained, and at the same time presented to him the draft of a deed to be by him executed and delivered to the plaintiffs, a copy of which, marked " C," is hereto annexed.

And the plaintiffs well hoped that no dispute would have arisen touching the aforesaid mistake, error and wrong drafting of said deed from the defendant to the plaintiffs, but that the defendant would have complied with the reasonable request of the plaintiffs as in conscience and equity he ought to have done; yet the defendant absolutely refused to comply with the plaintiffs' said request, and at times pretends that there is no mistake or error in the description contained in said deed, and that said description in said deed is correct, and is correctly drawn, and that he never agreed, verbally or in writing, to convey to the plaintiffs the right to hold the water fifteen inches higher than the permanent part of said dam as hereinbefore set forth, or any other, or greater rights, privileges or easements than are in said deed contained, and that he now has and holds all the rights, privileges or easements touching and concerning his said lands which are not conveyed to the plaintiffs by his said deed, and by law ought to have and hold his said lands subject to no other or greater rights, privileges and easements than are in said deed set forth and contained.

Wherefore the plaintiffs pray that the defendant may be compelled to quitclaim and release, with a release of the right of dower, to the plaintiffs, the right to flow any lands which may be flowed or affected by the plaintiffs' maintaining their dam at Union Bridge fifteen inches higher than the permanent part thereof, according to the stipulations in said paper, marked " A," and subject to the proviso therein contained, and

that said deed from the defendant to the plaintiffs may be reformed by a decree or otherwise, that the same shall convey the rights, privileges and easements hereinbefore mentioned and described and in said· paper in writing marked " A " contained, and that the said error and mistake in said deed may be thereby corrected, and that said rights, privileges and easements of the plaintiffs as claimed by them, may be established according to the provisions of said written agreement; and that an injunction may issue against the defendant, ordering and commanding him hereafter to desist from any and all proceedings at law or otherwise against the plaintiffs by reason of holding back and discharging water from their reservoirs above Sanbornton Bay as they had been and were doing at the time of making said agreements in writing, and afterward continued to, do during the lifetime of their said agent—James Bell— and as they shall hereafter have occasion to do, in accordance with said settlement, agreements in writing, and said deed of conveyance tendered as above stated.

And the plaintiffs pray for an injunction against the defendant, commanding him to cease from prosecuting his said suit at law against the plaintiffs until a final hearing and determination upon this complaint, and for such other relief as may be just.

JOSIAH B. FRENCH.

STATE OF NEW HAMPSHIRE, }
     BELKNAP, ss.        }

On this nineteenth day of July, A. D., 1862, personally appeared Josiah B. French, above named, and made oath that the facts alleged in the foregoing bill, so far as the same are of his own knowledge, are true, and so far as the same are of his information and belief, he believes the same to be true.

    Before me,       GEO. W. STEVENS, *Justice of the Peace.*

"B."

"E."

KNOW ALL MEN BY THESE PRESENTS,

That I, John L. Perley of Meredith, in the county of Belknap, and State of New Hampshire, for and in consideration of the sum of thirteen thousand dollars to me paid by the Winnepisscogee Lake Cotton and Woolen Manufacturing Company, a corporation existing under the laws of said State, before the delivery hereof, the receipt whereof is hereby acknowledged, have remised, released and forever quitclaimed, and by these presents do remise, release and forever quitclaim unto the said Winnipissiogee Lake Cotton and Woolen Manufacturing Company, and their successors and assigns forever, my mills, machinery, apparatus and appurtenances and mill privilege, in Sanbornton and Gilmanton, near Union Bridge, including the land on the Sanbornton side of the river lying between the road leading from said Union Bridge to said Perley's Mills and the Winnipissiogee river, and extending from the Shirley land (so called) to the intersection of said road with the road leading from the Depot over Burleigh Bridge. And also the land between said

last mentioned road and the river and bay, and extending westerly to land of Jacob Bamford.   Also, all said Perley's right in that part of the Shirley land lying between the first mentioned road and the river.

Also, the right to make a canal across said Perley's land, in the hollow or lowest part of the same, twenty-five feet wide, which lies in the angle between said roads, for the purpose of taking the water of said river to the land lying westerly of said mills and the bay, and the right of flowing the said land of said Perley so far as the same may be flowed by raising the dam at said mill site to an increased height, or by constructing said canal.   Provided, however, that said company shall maintain an embankment of earth on the banks of said river and canal, to a greater height than they shall keep the water of said river at any time.

Also, a strip of land lying upon the Gilmanton side of said river, and embracing a certain piece of land below said bridge, lying between the road which runs southerly from said bridge and said river, and going down said river as far as said Perley's land extends.

Also, the land above said bridge and extending up said river to the land of said company, excepting the Boston, Concord and Montreal Railroad, which land is bounded southerly by said road leading across said Burleigh bridge, westerly by said river, northerly by land of said company, and easterly by a line beginning at a certain marked small pitch pine tree standing on the northerly side of said road, and distant from said river about one hundred and fifty-six feet, thence running northerly to a stake and stones at said railroad, set up by direction of Daniel K. Smith, when he last surveyed said lines, thence on same course to the line of said company's land in the direction of a crotched maple tree, bearing three marks, standing on said company's land, marked when said Smith made said survey, and distant from said river about ten rods.

And the said Perley also hereby grants to said company, in manner aforesaid, the right to flow any lands which he owns and may be flowed or affected by said company's keeping the water, by their dam at Union Bridge, twenty inches higher than Eager Rock, (so called,) near Meredith Bridge.   Provided, that said company shall not keep the water higher than said point, twenty inches above said Eager Rock, whenever they can keep the same down to said point by removing the flash-boards from said dam and by opening their wasteway which shall be enlarged to the width of sixty feet.

The said Perley excepts and reserves the use and occupation of the Grist Mill and Saw Mill and the Burleigh House, (so called,) with the barn and garden on said premises, until March 1st, 1856, he keeping the same in as good repair as they are now in except the dam and flumes, which said company shall repair, and pay the taxes upon the same, subject however, to the right of said company to discharge water from their reservoirs above said premises as they may have occasion.

And I hereby release to said company all claims and demands which existed prior to August 30th, 1852.

To have, and to hold, said granted and remised premises to said company, their successors and assigns, to their use and benefit forever,

and I do covenant with said company that I will warrant and defend said premises to them and their assigns against the lawful claims and demands of all persons claiming by, from and under me.

And I, Dorothy P. Perley, wife of said John L. Perley, do hereby release my right of dower in said premises.

In witness whereof we have hereunto set our hands and seals this twenty-sixth day of September, in the year of our Lord one thousand eight hundred and fifty-three.

L. A. RUNDLETT.                  JOHN L. PERLEY, [L. S.]
JERE. ELKINS.                    D. P. PERLEY,   [L. S.]

STATE OF NEW HAMPSHIRE, ⟩
          BELKNAP, SS.        ⟨

September 26th, A. D. 1853. Personally appearing John L. Perley acknowledged the foregoing instrument to be his voluntary act and deed.

Before me,                JERE. ELKINS, *Justice of the Peace.*

Belknap County Records. Rec'd Sept. 26, 1853, 3 P. M. Recorded Book 21, Pages 551 and 552. Ex'd by
                              NATH'L EDGERLY, *Register.*


"A."

Agreement between the Winnipissiogee Lake Cotton and Woolen Manufacturing Company, and John L. Perley, of Meredith, N. H.

Said Perley agrees to sell to said company, by quitclaim deed in the usual form, with a release of the right of dower, his mills, machinery and apparatus and appurtenances and mill privilege in Sanbornton and Gilmanton, near Union Bridge, including the land on the Sanbornton side of the river, lying between the road leading from Union Bridge to said Perley's mills and the Winnipissiogee river, and extending from the Shirley land, so called, to the intersection of said road and the road leading from the depot over Burleigh Bridge, and also the land lying between said last mentioned road and the river and bay, and extending westerly to land of Jacob Bamford :

Also, all said Perley's right in that part of the Shirley land lying between the first mentioned road and the river :

Also, the right to make a canal across said Perley's land in the hollow or lower part of the same, twenty-five feet wide, which lies in the angle between said roads, for the purpose of taking the water of said river to the land lying westerly of said mills and to the bay ; and the right of flowing the said land of said Perley so far as the same may be flowed by raising the dam at said mill site to an increased height, or by constructing said canal ; provided, however, that said company shall maintain an embankment of earth on the banks of said river and canal to a greater height than they shall keep the water of said river at any time :

Also, a strip of land lying upon the Gilmanton side of said river and embracing a certain piece of land below said bridge lying between the

road which runs southerly from said bridge and said river, and going down said river as far as said Perley's land extends :

Also, the land above said bridge, and extending up said river to the land of said company, excepting the B. C. & M. Railroad—the width of said strip of land to be equal to the width or distance of said river at right angles from a certain small Norway pine tree standing on the easterly side of the road last mentioned, and distant about ten rods from said river, and nearly in a line with the fence between the tract of land last above described, and said road.

And the said Perley also agrees to grant to said company in manner aforesaid, the right to flow any lands which he owns, and which may be flowed or affected by said company's maintaining their dam at Union Bridge, fifteen inches higher than said permanent part thereof, provided that said company shall not keep the water higher than said point, fifteen inches higher than said permanent part of said dam, whenever they can keep it down to the same by removing the flash-boards from their dam, and by opening their wasteway, which shall be enlarged to the width of sixty feet.

And said company agree to pay said Perley, as the consideration of said grants and agreements, twelve thousand four hundred dollars, and convey to him in fee by a warranty deed, in the usual form, a certain tract of land in said Gilmanton, being part of the Pearson land, so called, to wit, the land lying southerly of line drawn in extension of the line hereinbefore described, as the southerly boundary of the land in Gilmanton, which said Perley agrees to convey to said company which line shall be of equal width with the strip which shall be conveyed to them by said Perley, until the said line shall intersect the wheel way or path leading from the Gilmanton road, near the house of Henry M. Pearson, to said company's saw mill, and then said line shall follow said path to said Gilmanton road, containing ten acres more or less :

Also, a right of way in said last mentioned path, from said road to his lands, and across the B. C. & M. Railroad, and a right to a passage way below said railroad from said Perley's land to the river for water for his animals.

And said company agree that said Perley shall, in his said conveyance to said company, except and reserve the use and occupation of the grist mill and saw mill and the Burleigh house, so called, with the barn and garden on said premises, until March 1st, 1856, he keeping the same in as good repair as they are now in, except the dam and flumes which said company shall repair, and paying the taxes upon the same, subject however, to the right of said company to discharge water from their reservoirs above said premises, as they may have occasion.

It is further agreed that releases of all claims and demands shall be executed to each other by said Perley and said company, and that all pending actions shall be entered " Neither Party."

It is further agreed that said company shall have a reasonable opportunity to investigate the validity of said Perley's title to said property by him to be conveyed. If his title to any part thereof shall prove defective, a proportionate abatement or return of part the price of said land

shall be made by him to said company, the amount of which shall be determined by Hon. George Y. Sawyer, as referee, who shall also decide in relation to the sufficiency or defects in said title.

The Winnipissiogee Lake Cotton and Woolen Manufacturing Company,                 By their agent JAMES BELL.

Aug. 30, 1852.                       JOHN L. PERLEY.

Aug. 30, 1852. The W. L. C. & W. M. Co. agree with J. L. P. that he shall have the crops now growing on the land which he has this day agreed to convey to said company. Also, that if said company shall raise the height of the dam upon said premises, they will make such arrangements for said Perley's use of the mills and running of logs to them during the time for which he is to have the use of them, as will be as convenient to him as they now are, and said Perley shall have the right at any time within one year to cut off the wood growing on the land in Gilmanton, to be deeded by him to said company.

## IN THE SUPREME JUDICIAL COURT.

BELKNAP, SS..

### W. L. C. and W. M. Co. *v.* JOHN L. PERLEY.

#### ANSWER TO AMENDED BILL.

The defendant admits that on the thirtieth day of August, 1852, and for about six years prior thereto, the plaintiffs were owners in possession of a tract of land as alleged in said amended bill.

The defendant denies that the plaintiffs, and those under whom they hold, from time immemorial, by means of dams across said river on said premises, and the flash-boards thereon, have kept up and maintained the water in Sanbornton Bay as high as the plaintiffs have kept up and maintained the same by means of their present dam and flash-boards on said premises.

The defendant denies that the plaintiffs, and those under whom they hold, by means of flash-boards, kept and maintained on the top or permanent part of said dam, or by any other means, ever since the autumn of 1828, or during any year since 1828, except at occasional intervals, have raised and maintained the water in Sanbornton Bay fifteen inches higher than the top or permanent part of said dam.

The defendant denies that the plaintiffs, and those under whom they hold, at any time possessed the right of holding back and discharging the waters of Winnipissiogee Lake and Sanbornton Bay, to the extent which they have held back and discharged the same, and denies that they were accustomed to exercise such right until about the year 1847, but the precise time the defendant is unable to state.

The defendant denies that he at any time brought any action against the plaintiffs for alleged flowage of the island in Little Bay, referred to in

said amended bill, except the suit now pending in the supreme judicial court.

The defendant, protesting that the pendency of any action in favor of another party against the plaintiffs must be wholly irrelevant to this case, admits that on said thirtieth day of August, 1852, a suit was pending in the court of common pleas, for Belknap county, in favor of James P. Morrison, against these plaintiffs as alleged in said amended bill, but what other suits in favor of owners of land and mill privileges on said river were then pending, the defendant does not know.

The defendant denies that the plaintiffs at any time entered into any negotiations with him for an adjustment of his suits that had, so far as he knows, any reference to or connection with any adjustment or negotiations with any other party, and denies that any such adjustment was made to his knowledge for the same right as to each of them, for holding back and discharging waters in and from said Sanbornton Bay, but the defendant admits that the plaintiffs entered into an agreement with the mill and land owners at and near said Avery dam, by which the plaintiffs were to be entitled to keep up the water in Sanbornton Bay to the top of a certain iron pin in Table Rock, being fifteen inches higher than the top or permanent part of the rolling way of said dam, as in the agreement, a copy of which, marked "N," is annexed to said amended bill, will more fully appear.

The defendant admits that the paper, a copy of which marked "A," is annexed to said amended bill, bears his genuine signature, but the defendant says that in the contract which he made with James Bell, the plaintiffs' agent, prior to the signing of said agreement, he did not in any way agree to grant to said company the right to flow his lands by maintaining their dam at Union Bridge fifteen inches higher than the permanent part thereof, nor anything of like import, and the clause to that effect inserted in said agreement was permitted to remain therein wholly through accident and mistake.

The defendant denies that he ever agreed, or that he or the said James Bell ever understood, expected or believed that the defendant had agreed to release or quitclaim to the plaintiffs the right to hold the waters in Sanbornton Bay fifteen inches higher than the top or permanent part of said dam, or any right whatever to hold said waters except as is provided in the agreement, a copy of which, marked "B" is annexed to said amended bill.

The defendant denies that he at any time agreed to release or quitclaim to the plaintiffs any right to hold back or discharge waters from their reservoirs above and from said Pearson dam, as they might have occasion, but the defendant admits that by virtue of his agreement of August 30, 1852, he was to reserve the use and occupation of a certain portion of his premises until the first day of March, 1856, subject to the right of said company to discharge water from their reservoir above said premises, as they might have occasion, as will be seen by reference to the agreements, copies of which, marked "A" and "B" are annexed to said amended bill.

The defendant denies that he understood, expected or believed at the

time of making said agreement that twenty inches of water on the Eager Rock in the management and regulation of the waters of said bay would at all times be equal to fifteen inches on the top or permanent part of said dam, but what difference there might be the defendant had not at that time any knowledge or belief.

The defendant does not know what the understanding, expectation or belief of the said James Bell was, but the defendant does not admit that the said Bell understood, expected or believed that twenty inches of water on said rock, in the management and regulation of the waters of said bay, would at all times be equal to fifteen inches on the top or permanent part of said dam.

The defendant denies that, when said writings were about to be executed, it was suggested by him that the conveyance from him to the plaintiffs should be made differently, with regard to the height to which the water might be kept in Sanbornton Bay, from the agreement previously made between the parties, or that conveying the right to keep the water twenty inches over said Eager Rock would convey the same right as if the description were of the right to keep the water fifteen inches on said dam, and the defendant denies that the erasures and interlineations now appearing on the original paper, a copy of which is annexed to said amended bill, and marked "B," were made for any reason except because the defendant never had agreed and utterly refused to agree to grant to the plaintiffs a right to keep said water any more than twenty inches above said Eager Rock.

The defendant says that, after he and the said James Bell had completed their verbal agreement, by which the plaintiffs were to be permitted to keep the water twenty inches higher than the Eager Rock, the said Bell drew up said agreements marked "A" and "B," and inserted therein, without any authority from the defendant, the clause relative to keeping said water fifteen inches higher than the permanent part of said dam, instead of twenty inches higher than the Eager Rock, and at the time of the execution of said agreements the said Bell represented to the defendant that the alteration would be more favorable to the defendant than the original agreement, but the defendant wholly refused to agree to said alteration, and the said Bell thereupon erased from said agreement, marked "B," all that part which provided for keeping the water fifteen inches higher than the permanent part of said dam, and inserted in its place that part which provides for keeping the same twenty inches higher than the Eager Rock, as had been verbally agreed before said writings were drawn up, and the said Bell fully intended to make the same change in the agreement marked "A," but omitted to do so through accident and mistake.

The defendant says that he never knew, or in any way mistrusted that said agreement marked "A" had been signed by him containing the clause in regard to holding the water fifteen inches higher than said dam, until about the first of September, 1861.

The defendant denies that the said James Bell, at any time made or caused to be made, and placed on said dam any flash-boards in pursuance of any agreements or stipulations between the plaintiffs and the de-

fendant, by means of which the water at the Pearson dam might be held fifteen inches higher than the top or permanent part of said dam.

The defendant denies that the plaintiffs have ever enlarged their wasteway in said Pearson dam to the width of sixty feet, as provided in said agreements marked " A " and " B."

The defendant says the deed, which he gave to the plaintiffs in pursuance of said agreement, did not release or quitclaim, and said deed was not, at the time it was received nor at any time afterwards, understood by the defendant, nor by the said Bell, so far as the defendant knows, as releasing or quitclaiming any right to discharge waters from the plaintiffs' reservoirs above and over and through said Pearson dam, nor any rights, privileges or easements except such as are plainly and clearly inserted therein.

The defendant says that, though the plaintiffs at different times after the settlement of August 30, 1852, and after the execution of said deed, occasionally kept the water in Sanbornton Bay higher than they lawfully might do, according to the terms of their agreement with the defendant, yet he never in any way heard or suspected that they claimed a right to keep the water more than twenty inches higher than said Eager Rock, except in times of high water, as is provided in said agreement marked " B," until about the first of September, 1861, and the defendant says that he repeatedly complained to the said Bell of the management of the water in said bay by the plaintiffs, while said Bell was acting as agent of said company.

The defendant denies that the plaintiffs, so far as he then knew or now knows, were induced to pay and did pay the sum of money and other considerations in said writings by them stipulated to be paid, chiefly and mainly for the right peaceably and quietly to hold the water by and on said Pearson dam fifteen inches higher than the permanent part thereof, though the defendant is unable to say what the understanding of said Bell was with regard to the difference between fifteen inches of water on the permanent part of said dam, and twenty inches on Eager Rock.

The defendant says that the question what height of water on said dam would be equal to twenty inches on said rock was never material for him to know, that he has never caused any measurements to be taken for the purpose of ascertaining, as it in no way concerned him, as he supposed that, before and at the time said agreement was made, he agreed to permit the water to be raised on his land as high as twenty inches over Eager Rock would raise it, and no higher, except in times of high water, as is provided in said agreement marked " B ;" that he never intended, and the said James Bell did not, at the time said agreements were executed, nor afterwards, to the time of his decease, understand that the defendant intended, or had in any way agreed, to grant to said company a right to keep the water permanently any more than twenty inches higher than said Eager Rock; that if said dam had been a permanent object, and had been accessible to the residence of the defendant, he should not have agreed to take the height of water at that place without first ascertaining what height of water there would be equal to twenty inches on said rock, and should not have agreed to any point that would

have made more than twenty inches on said rock, without additional compensation.

The defendant says that he does not know what difference there is in times of high water in said bay, between twenty inches of water on the Eager Rock and fifteen inches on the permanent part of said dam, nor does he know what height of water on said dam is at such times equal to twenty inches on said rock, nor does he know what height of water on said rock at such times is equal to fifteen inches on said dam, and so the defendant does not admit the allegations of said amended bill in relation to said matters but leaves the plaintiffs to their proof.

The defendant says that, at the time said writings were executed, he supposed, and in his belief, the said James Bell must have supposed, that there would be a fall between the Eager Rock and the Pearson dam, at times when there was a great flow of water over and through said dam, but the defendant had not, and the said Bell may not have had, any impression that there would be so great a fall as is set forth in said amended bill, but the defendant denies that if the said Bell had fully understood the fall to be as stated therein, he would have declined to enter into the agreements contained in said paper marked "B" and in said deed.

The defendant says that, judging from the subsequent acts of the plaintiffs, their object in making said settlement with him had very little, if any, reference to the use of water at the Pearson dam, but the principal if not the sole object of the said James Bell, in making said settlement, was to procure a right to hold the waters of Sanbornton Bay at a particular height as a reservoir for the use of manufacturing establishments below Union Bridge; that said object is substantially accomplished whenever the requisite height of water in said reservoir is obtained, without regard to the head of water which is created at Pearson dam; that Sanbornton Bay is a large sheet of water, about ten miles long, and varying in width from one to three miles, except in a few narrow places, and with little, if any, perceptible current; that the outlet of said bay into the Winnipisseogee river is about one hundred rods above said Pearson dam; that the fall between said Eager Rock and the outlet of said bay, at any stage of the water, is very little, but what, the defendant is unable to say; that almost the entire fall between Eager Rock and the Pearson dam is in said river; and so the defendant says that whatever misunderstanding, if any, the said Bell may have had with regard to the difference between twenty inches of water on Eager Rock, and fifteen inches on said dam, the object which the plaintiffs had in making said settlement, as appears by their subsequent acts, are substantially gained already, whereas if the prayer of said amended bill should be granted, it would not only be grossly unjust and ruinous to the defendant, but would give to the plaintiffs, in times of high water, a height of water throughout the whole surface of said reservoir or bay, (except the small space occupied by said river between the outlet of the bay and the dam,) about fifteen inches greater than said Bell or the defendant, according to the statement of said amended bill, expected or understood, and so the defendant denies that the settlement intended to

be made has been prevented or defeated, or the plaintiffs deprived of any substantial benefit or advantage which they expected to derive from the money and other considerations paid to the defendant, or to the mill and land owners at and near the Avery dam, or the rights, privileges and easements granted by the defendant to the plaintiffs rendered worthless or substantially of any less value than was understood and expected by the plaintiffs, as appears by their subsequent acts.

JOHN L. PERLEY.

BELKNAP, SS.—September 5, 1862.

Then personally appeared said John L. Perley, and made oath that the foregoing answer, by him subscribed, is in his belief true.

Before me.          E. A. HIBBARD, *Justice of the Peace.*

*Stevens, Vaughan, and Whipple,* for plaintiffs.

*E. A. Hibbard and Pike* for defendant.

NESMITH, J.   The defendant first answered the original bill of the plaintiffs and its several material allegations, under oath, and again filed a subsequent answer to plaintiffs' amended bill, wherein he denied many of the facts and allegations contained in the said amended bill, admitted some and qualified others, as will appear by reference to said bill and answers.   To sustain the allegations of their bill and answers, and as explanatory of their several views or theories, the parties have severally furnished a voluminous mass of testimony, showing the original construction of the old Union Bridge dam, as early as 1804, its occupation, ownership, and the usages under it, the several mills erected on it, the water used to carry on these mills and the effects of the rise of water, occasioned by the dam, upon the lands and privileges of owners above it.

Then we have the continuous history of the Pearson dam, erected near the old one, under the immediate superintendence of the experienced architect, John Clark of Franklin.

We find the second dam erected, or renewed, in the fall of the year 1828.   The Pearson dam was called a rolling dam, sustained by box, cribs, spiling, planking, &c., intended to be compact and close.   It contained, also, in addition to the ordinary flumes necessary to carry two saw mills, a grist mill with a fulling mill, a wasteway with movable plank or slabs therein, and of the width of 30 feet.   The two dams generally, from the beginning, had flash boards located on their permanent parts, or on the tops thereof, which were also movable. The height of the water above the dam was generally regulated by the owners and occupants according to their wants, by the use of more or less of these flash boards on the dam, or planks in said wasteway. The flash boards, and sometimes more or less of the planks in the wasteway, were often removed in times of freshets, or high water, and again replaced as the water subsided, and were retained in use in all times of

low water.   The surface of the Pearson dam, erected in 1828, was uneven, and the master workman, Clark, testified that after the dam was finished, he caused flash boards of the width varying from 12 to 16 inches to be placed on the top of the dam, and that it then required six days and nights to raise the water so as to flow one foot over the dam. The general current of the testimony of both sides establishes the fact, that flash boards have been usually kept on the top of the Pearson dam of the width varying from 6, 10, 12, 15, 16 and even 20 inches, according to the structure or conformation of the top of said dam, and the supply of water kept above it, up to the year 1846, when the plaintiffs purchased the privilege, and took possession thereof.   And from this time, especially since August, 1852, plaintiffs have labored to keep up the water in said dam by means of the use of flash boards, at least 15 inches above the top of the permanent part thereof.   And the defendant complains that the plaintiffs have so kept up their dam as to cause the water above in Sanbornton Bay to flow his lands, and the cellar of his store, &c., to his injury, and in violation of established rights and usages, before acquired, and of the contracts of the parties.   It also appeared in evidence, that, on the 15th day of July, A. D. 1859, defendant commenced his last suit, claiming special damages of the plaintiffs, for injuries so sustained, in consequence of this flowage, as will appear by his writ which is in evidence in the case.   The plaintiffs, upon application, obtained from the Chief Justice of this Court a temporary injunction of this suit, until an examination could be made, and a decision had upon the several matters embraced in plaintiffs' said bill and defendant's answers thereto, and the other evidence submitted in the case, especially upon the consideration of the rights of the respective parties, arising out of their mutual contracts of August 30th, A. D. 1852, and the subsequent deed of conveyance from the defendant to plaintiffs, made and executed on the 26th day of September, 1853, and the several negotiations connected therewith, illustrative of the meaning and intent of the parties thereto.   The plaintiffs allege, that, by virtue of said settlement, and deed of conveyance, it was intended by the parties, that the water-mark, mentioned in said deed, of 20 inches on the Eager Rock, was to be equivalent to 15 inches of water on the permanent part of the Pearson dam, under the limitations recited in said deed, and that the settlement was made upon this basis.   All which, plaintiffs say, is made apparent from the deed itself, and from the declarations, admissions and acts of the parties thereto, and from the other evidence in the case.   The aforesaid deed from the defendant, among other recitals, contains the following specific stipulation : "And the said Perley also does hereby grant to said company, in manner aforesaid, the right to flow any lands which he owns, and which may be flowed or affected by said company keeping the water by their dam at Union Bridge twenty inches higher than Eager Rock, so called, near Meredith Bridge, provided that said company shall not keep the water higher than said point—twenty inches above said Eager Rock—whenever they can keep the same down to said point by removing the flash boards from said dam, and by opening their wasteway, which shall be enlarged

to the width of sixty feet." In looking at the aforesaid special provision, in connection with some other expressive language therein, the parties seem to have been contracting for two leading objects : First, to settle permanently the water rights of the parties, and especially the use of the water at and by means of the dam : Second, so to regulate the water, by enlarging the capacity of the wasteway, and by regulating the flash boards thereon, that plaintiffs might use the waters above, in the most practicable manner as a reservoir, providing greater facilities for its passage through their dam, and with the least prejudice to the rights of the defendant. To these apparent leading objects of this deed of release was superadded the third, which was finally to adjust two suits at law in favor of the defendant against the plaintiffs, which were then pending, and had been sometime litigated at large expense, and all other claims for damages for alleged injuries previously sustained by defendant to his lands adjacent to Sanbornton Bay and his other lands and privileges, by means of the improper use and management of said dam. It was important to the parties to adjust satisfactorily their several conflicting rights, so far as the past was concerned, and if possible, securely for the future. Hence, to obviate difficulties likely to hereafter arise, lands were conveyed by defendant, reservations made, especially 60 feet of wasteway in plaintiffs' dam was obtained by defendant, where only 30 feet was provided before. This was to be prepared at plaintiffs' expense ; and the plaintiffs say, by the interpretation put upon the language of said deed by said defendant, in consequence of making the aforesaid Eager Rock the ruling water mark to test the height of the water in said Bay, they are likely to suffer, more especially if the survey of Wm. P. Crocker be adopted as the true trial test of the comparative standard height of water at said rock, and at said Pearson dam. Now, if there have been introduced into said deed any material stipulations, or ruling monument, upon principles plainly contrary to the real intention of both parties, and under a material mistake, then the deed should be reformed, and such mistake should be corrected. Judge Story says, " to allow a mistake to prevail under such circumstances, would be to work a surprise or fraud upon both parties, and certainly on the one who is to suffer." 1 Story Equity, secs. 155, 156, and 157.

We propose briefly to examine the facts of the case, and the rights of the respective parties at the time of the conveyance, and ascertain, if possible, their legal position.

The plaintiffs start with the proposition, that the settlement and conveyance were upon the express grounds and understanding, that the water mark on the Eager Rock, being the monument stated in the deed as limiting the height of the water to twenty inches above said point, was, by the parties made and considered equal to 15 inches on the top of the Pearson dam. Let us examine the deed itself, and obtain its true construction, in connection with the other controlling facts of the case.

The familiar rule of construction, incident to all deeds is, that such a rule of interpretation must be given to the deed, as will most effect-

ually carry out the intent of the parties. *Jackson* v. *Blodgett,* 16 Johnson, 172. When the language used is susceptible of more than one interpretation, the Court will look at the surrounding circumstances existing when the contract was entered into, the situation of the parties, and the subject matter of the contract, and all the provisions and expressions of the instrument. 2 Cowen 195 ; Willes' Rep. 332 ; 13 Peters 89 ; 5 Watts 34.

Deeds are to be construed with reference to the actual rightful state of the property at the time of their execution. Property conveyed passes with all its incidents, privileges and easements belonging to it at the time of the conveyance. *Dunklee* v. *Wilton Railroad,* 24 N. H. 497 ; *Seavey* v. *Jones,* 43 N. H. 441 ; *Thompson* v. *Banks,* 43 N. H. 540. Where the instrument is ambiguous or doubtful on its face, the court may resort to parol, extrinsic evidence, to remove doubt. *Gerrish* v. *Towne,* 3 Gray 88 ; 1 Greenleaf Evid., sections 293 and 286. From the extract of the deed before referred to, it appears to us, the conveyance was evidently based upon the understanding, that the plaintiffs were to enjoy and regulate the waters of the river and bay by means of their dam, and by no other agency, and in order to raise the water 20 inches on the Eager Rock, although nearly six miles off, it must be done by means of the plaintiffs' dam with its 15 inches of flash boards on the top. The deed, therefore, implies the existence of the dam, always operating so as to produce the aforesaid continued desired result ; and it also implies the pre-existence of the dam, because from the testimony of Clark and others, it required, with the use of flash boards, from four to six days to raise the water about a foot in the large bay above. Hence, the dam, as a cause, is presumed first to exist, in order to produce the legitimate effect of raising the water at Eager Rock. The dam is to be there, with all its justly acquired or customary rights or easements, both for the purpose of carrying on the mills, for which it was originally erected, and for the new and legitimate purpose of establishing a reservoir, under the limitation of widening the wasteway, and regulating the flash boards on the dam and the plank in the wasteway, so as to keep down the water on the Eager Rock whenever practicable, under the application of a reasonable use of the means indicated by the contract. The widening of the wasteway would enable the occupant of the dam to let off a greater quantity of water in a shorter time, therefore, was intended to be protective of the defendant's interests. In the same manner, by discharging a greater quantity of water in a shorter time, it would prove to this extent useful as a reservoir to the plaintiffs' works below. Such may be presumed to be the intent of the parties in introducing this new limitation, to be practiced upon at plaintiffs' dam ; and, subject to the wise use of this regulating limitation, now introduced for the first time, the plaintiffs' dam was to be the regulator of the water at defendant's monument, and everywhere above it in in the bay. The conveyance also speaks plainly of *flash boards* to be *removed* from the dam at certain times, in order to reduce the water to a certain standard point. This, of course, would be in times of high water, when they were to be removed. This language

plainly implies the customary use of flash boards on the dam, subject to the new modified use, now adopted under the contract of the parties.

Again, the cotemporaneous writings, made between the parties at or near the time when the deed was executed, relating to the same subject matter are admissible in evidence. 1 Greenleaf's Evid. section 283, and authorities in note. The court will also call in aid the acts done under the contracts and deed as a clue to the intention of the parties. The common use and possessory acts give an interpretation to the instrument, especially to ancient grants. 16 Johnson, 22; 3 Atkins, 576; 10 Vesey, 338; 7 East, 199; 4 East, 327; 8 Bingham, 181; *French* v. *Cohart*, 1 Comstock, 96.

Look at the acts of Mr. Bell, the agent of the plaintiffs, after negotiating the settlement of August 30th, 1852. On completion of that contract with defendant, he immediately instructed the engineer then in his employment, Ham, to have the flash boards so made as to keep the water fifteen inches above the top or permanent part of the Pearson dam, and no more. Mr. Bell also instructed said Ham to procure Daniel K. Smith, a civil engineer and surveyor of lands, to take his levelling instruments and proceed to Union Bridge, and find some stone or monument above and near said dam, and establish a high-water permanent mark, which was to be fifteen inches above the top of the dam. This standard mark was established, according to the order, and the flash boards were located according to the direction then given, in the same autumn after the settlement.

The mark established was a *cross cut* into a stone, on the Gilmanton shore, above the dam and near to it, and there yet remains, as the result of the order then given, being fixed, as Ham states, fifteen inches above the permanent part of the dam. The same witness testifies, that, pursuant to orders from the same source, the wasteway was widened to to the width of sixty feet, according to the terms of the aforesaid agreement of the parties. This work was executed on or before January, A. D. 1853. He also testifies that he had orders from Mr. Bell, which he caused to be executed, that when any extra opening of the wasteway of the dam at Lake Village was made, then he was to go directly to Union Bridge, and have a corresponding opening made there, so as to keep the water within fifteen inches above the top of said dam. It is true, it is not in evidence, that the defendant was present when the aforesaid acts were done at the plaintiffs' dam; but the original contract of August, 1852, shows, that defendant was to occupy, under a lease, the Atkinson dam and the adjacent premises, up to March, 1856, which were situate but a short distance below the Pearson dam, and that he had means of obtaining knowledge of the proceedings of Mr. Bell, and that he acquiesced in them, making no complaint during his occupation, except that, in 1855, on one occasion, he did complain to Mr. Bell, that the water was too high, or that he, (Mr. Bell,) was keeping it too high. We think it would not be unfair to use the contract "B," which was signed by both parties, as evidence of the plaintiffs' expectation and belief, as to the rights to be acquired under said contract, and that Mr. Bell considered fifteen inches on the top of the dam, as the standard le-

gal height, to which the water might be there raised and kept; because we find his acts and declarations, while alive, all tending in the same direction to sustain this position.    It was in evidence, that a suit was brought by those interested in the Avery dam privilege, in the name of James P. Morrison against the plaintiffs for alleged injury sustained at the Avery dam, and, that this action was tried by the jury, in the year 1851, and that defendant also had an action tried in the year 1849, which was for a claim of damages against the plaintiffs for the alleged flowage of his lands, &c., adjacent to Sanbornton Bay; by reason of plaintiffs' said dam.

In the former case, there was a verdict for the plaintiffs.    In the latter, there was no verdict, the trial resulting in a disagreement of the jury.    Mr. Bell was counsel for the present plaintiffs in both of said suits.    It was in evidence, that, after the verdict in the Morrison case, the water was reduced by the order of Mr. Bell, at the Pearson dam, by the removal of the flash boards, and by their different management, from the height of seventeen inches to fifteen inches, and no more. This regulation was made prior to August, 1852, and was indicative of the plaintiffs' claim prior to that time.    As to the defendant's knowledge and admissions on the point, it was shown in evidence from the defendant, that Mr. Bell informed him, when inviting him to sign said contract of August 30th, 1852, that the top of the rolling or permanent part of the Pearson dam was 4 2-5 inches higher than the top of the Eager rock, and that this fact appeared from the actual survey of engineer Daniel K. Smith, which had been used in the said Morrison trial, and that twenty inches on the said Eager Rock would be equal to fifteen inches on the Pearson dam.    Defendant admits in his deposition that Mr. Bell asked for twenty-four inches to be inserted as the height on the Eager Rock, but that he declined to grant the request.    Again, defendant does not insist that he had any other preference for the Eager Rock as a standard monument, in his contract or deed, except that it was more accessible to him, being near his residence in Laconia Village, and was a monument with which he had been familiar from his youth, and because he considered it of a more permanent character than any one at the dam.    (See answers to interrogatories 196 and 203 in his deposition.)    Such were the reasons assigned by defendant for preferring the rock to the dam.    The table of admeasurements, which was prepared by the said Smith, was, by agreement of the parties, used as evidence in this case, being the same used on the Morrison trial, as we understand.    This furnishes Smith's results of the relative comparative height of the top of the Pearson dam with the top of the Eager Rock. And the evidence is very conclusive that this table formed the ruling guide for the settlement of these relative heights, by the respective parties to the contracts.

We are not called upon to vouch for the authenticity or correctness of the engineer Smith's survey.    It is enough that both parties appear to have adopted this survey, supposed to have been correct, as the basis of their settlement, in adjusting the respective heights of the water, both at the dam, and at the Eager Rock.    We hear of no other measure or

test being referred to by either party. Both parties would, therefore, be bound to stand by what they reasonably supposed to be correct; and if, through any error or miscalculation of the engineer, a mistake had been committed, injurious in its consequences to one of the parties, then equity will interpose and come to the relief of such suffering party. The rules of equity require that such mistake shall be clearly made out. The defendant does not ask that plaintiffs should sacrifice any right before enjoyed, unless, perhaps, he might calculate upon a more speedy reduction of high water, when injurious to him, by the removal of flash boards, and the like removal of plank from the wider wasteway in plaintiffs' dam. While defendant may be considered as deriving some advantage in this direction, he must be presumed, in consideration of the liberal compensation made and received by him, as yielding on his part some advantages to the other side. Hence, in the experience of the parties, there would be times of freshets, or when the plaintiffs, in the exercise of their reservoir rights, would naturally let out, from their dams above, quantities of surplus water to supply their wants below, when the plaintiffs, under a vigilant and reasonable exercise of their rights and duties, must open their wasteway, and remove more or less of the flash boards from their dam, so as to let off, as soon as possible, their redundant waters.

All this is to be done consistently with plaintiffs' former and recently acquired usages, easements or agreement, and upon the implied covenant, that plaintiffs were not to lose any of their water privilege, nor any of their *head* and *fall* at their dam, but to be consistent with all rights before enjoyed. And the parties must be expected to give a reasonable time for the exercise of the several duties and obligations recently imposed. Sanbornton Bay furnishes an area of more than eleven square miles. The regulation at the dam must be had with due reference to the quantity of water, and the time necessary for it to spread over this large surface of the bay, and, of course, with a due regard to the natural obstruction at the outlet of the bay, above Union Bridge, or the sandbar located there, and the artificial obstructions occasioned by the abutments and piers of the Union Bridge, narrowing greatly the channel of the river at that point; also, with a proper regard to the general direction and operation of the wind, all combining to render the task of regulating the water at the dam both delicate and difficult.

In this connection, the proofs arising from admeasurements of Edwards and others of the depth of the water on Eager Rock, as made at different times, must not be disregarded. From its location, being at the termination of the river and at the commencement of the bay, it is very obvious, from the facts shown by these different admeasurements, that, in times of freshets or high water, the water tends to pile up at the head of the bay, and that considerable time must necessarily be required for it to spread out on the aforesaid large surface, before it will obtain its natural level. This evidence must be weighed with that other fact, furnished by the engineer, Crocker, that, from Eager Rock for the distance of about five miles below, there is less than one inch of *fall* in

the bay. Experience and practical skill would necessarily be required to give all parties in interest their just legal advantages.

It is urged in argument, that if the dam were entirely removed, still defendant might suffer from the obstructions furnished by the sandbar and the bridge. We need not stop to inquire how this might be, as it must be understood, this contract was made with reference to the fact, that the dam has been in existence for a long time, and still must continue to be used under the influence of these disturbing obstructions. That the defendant acted upon the full knowledge of Smith's survey cannot be doubted, by reference to interrogatory 40, and answer there given, in his deposition of 1861, also to question and answer 196 of his second deposition. Interrogatory 40 is thus expressed: "Do you understand that the top of Eager Rock, and the top of the dam (meaning the Pearson dam) are nearly on the same level?" Ans. "I have the impression that the dam, without the flashboards, is on a level with the top of Eager Rock, or nearly so."

Defendant again says, in answer to said interrogatory 196, in said second deposition of defendant, that "Mr. James Bell said, that by Smith's survey fifteen inches on top of the dam was three-fifths of an inch lower than twenty inches on Eager Rock, or words to that effect, and that it would be more convenient for them; therefore, he was in hopes I would agree to it. It would be better for me as the point was lower." Defendant declined to agree to it. Therefore, from the foregoing evidence it is very manifest the parties both acted with the full knowledge of Smith's survey. Again, that it could not have been the just expectation of the defendant by the settlement made to abridge the rights of plaintiffs, as before enjoyed, may be ascertained by his answer to interrogatory 332, in his second deposition: Int. "When said deed was written had you any idea that said dam was to be in height, in any way changed to correspond with the water mark on said Eager Rock, twenty inches above it?" Ans. "No, not that I know of." See also, interrogatories 264, 265, 266 and 267:

Interrogatory 264. "What did you understand at the time, as to the right of the company to keep flash boards on the dam?" Ans. "Well, I had no particular understanding about it. They had been in the habit of keeping flash boards on, when the water was low, when there was not a freshet. I supposed they would keep them on when they did not keep the water twenty inches above Eager Rock."

Interrogatory 265. "Did you understand by said settlement, that said company was getting the right in Sanbornton Bay any higher than they might formerly do?" Ans. "I supposed they were, so far as I was concerned in relation to those lands named in the agreement."

Interrogatory 266. "How much higher?" Ans. "Cannot say."

Interrogatory 267. "State as near as you have any means of telling." Ans. "Well, it would be a matter of opinion about it. I could guess that 20 inches over Eager Rock would make it about a *foot more* than they had a right to keep it formerly, perhaps *more*."

There are many other parts of defendant's testimony, tending to show that, in consideration of the liberal price paid and accepted by him, he

did not expect to gain to himself rights before enjoyed by plaintiffs, but to surrender *some* heretofore enjoyed by himself, as a permanent gain to plaintiffs. On this part of the case, see defendant's statements, that he ever afterwards expected that fifteen or twenty acres of his lands adjacent to the bay would be seriously affected or injured by the flowage by means of plaintiffs' dam. *Vide* interrogatories and answers in deposition, Nos. 271, 272, 273, 279, &c., as indicative of what defendant's reasonable expectations were.

The most manifest object of the settlement was to adjust permanently disputed rights. Hence, both the written contracts and the deed show that defendant's two suits at law then pending in court were arranged according to the terms agreed upon. By reference to the writs of defendant which were put in evidence in the case, it will be seen that the defendant had complained of flowage upon his lands to an extent equal to two feet, as unjustly caused by plaintiffs' dam. Admitting defendant's actual claim, upon his proof, to be far less, still it was an object of great consequence satisfactorily to adjust these disputes, and all other existing causes of a similar nature, and forever bar all similar future complaints, arising from this source.

The plaintiffs, then, for a good consideration, purchased of the defendant the right to flow his lands under the limitations of the contracts, also settled the suit at law, and, by the terms of paper marked " *E*," one of the actions was to be continued in court so long as that plaintiffs' rights should ripen, and be confirmed beyond the period of prescription, or the statute of limitations applicable to the Pearson dam.

The defendant, or those claiming under him, would, of course, be hereafter barred from setting up against his own acts and contract any claims thus surrendered. The doctrine of equitable estoppel applies here not only to the lands then owned by defendant, but would also apply to the same extent to any afterwards acquired by him which might be flowed or injuriously affected by plaintiffs' dam, as used at the time of said settlement.

Again, we are inclined to think the defendant puts a too limited construction upon the deed of September, 1853; the reservation therein contained, stipulating for the lease of the premises conveyed to plaintiffs. The language of the limitation is as follows, viz: " Subject, however, to the right of said company to discharge water from their reservoirs above said premises, as they may have occasion." The defendant says that this right, granted to plaintiffs, terminated with his lease, which expired in March, 1856. We are not aware that such a construction as is contended for by the defendant should be applied to this part of plaintiffs' deed. The language does not necessarily limit the time to March, aforesaid, or any other particular time, when plaintiffs may discharge water from their reservoirs above said premises, meaning the premises conveyed by defendant. One object of the conveyance was unquestionably to regulate the water with a view to the creation or enjoyment of the same as for reservoirs. It would be unreasonable to restrict the use of this privilege to so short a time as to render the grant comparatively useless.

In all cases of doubt raised by the language of the deed, that construction is to be applied, which is most favorable to the grantee. Therefore, we think that for all future time, the premises described in said deed are to be enjoyed, subject to the right of said company (or their successors) to discharge water from their reservoirs above, as they may have occasion. And, in this connection, it may reasonably have been intended by the parties to the deed, that the wasteway should be so enlarged as to discharge said water above, for the mutual advantage of both parties; both parties to receive benefits by the introduction of a new privilege or easement into the Pearson dam. From the foregoing, it will be seen that we derive a knowledge of the true intent of the parties to this conveyance:

First, From an examination and a fair construction of the language of the deed:

Second, From the examination of the cotemporaneous papers, or contracts of the parties:

Third, From the acts of the parties, done under the deed:

Fourth, From the admissions of the parties to the deed:

Fifth, From other extrinsic, oral proof, explanatory of the case, illustrating the true intentions of the parties, their position, and the subject matter of the contract, and relieving the deed of the defendant from doubt and ambiguity.

From these sources of light, we come to the conclusion, that the deed of the parties was executed upon the basis, that fifteen inches of water on the top of plaintiffs' permanent dam was then considered equal to twenty inches of water on the Eager Rock, or nearly so. Therefore, that plaintiffs should not take their dam down, except the water is raised more than fifteen inches above the top or permanent part thereof. And we find from the subsequent survey of Wm. P. Crocker, an experienced engineer, and the comparative admeasurements caused by him and others to be made, testing the relative heights of the water at different times, both at the Eager Rock and the plaintiffs' dam, that a material variance was found to exist between Smith's survey and said Crocker's, and to the prejudice of the plaintiffs. We are not called upon to say what will be all the legitimate consequences of the parties' contracts, or whether Crocker's survey is more to be relied upon than Smith's.

We find, however, that the parties, when they made their contract and deed, then rightly supposed Smith's survey and admeasurements were correct, and were guided by them, and that plaintiffs, on their part, are now, under the proof before us, entitled to have the deed reformed according to the prayer of their bill. The defendant, however, having heretofore commenced his said suit at law, which is pending still, and which was temporarily enjoined by the Chief Justice of this Court; and the defendant, having denied, in his answers, that plaintiffs have in all respects conformed to the spirit and just obligations of their contract and settlement, but have failed in several particulars to comply with the same, complaining that the wasteway in plaintiffs' dam has not been suitably widened and constructed, and that the water has been kept higher than fifteen inches above the top of the permanent part of

plaintiffs' dam by means of flash boards, and by locating thick plank on the rolling part, or top, of said dam, and that it has not otherwise been properly regulated by the removal of the flash boards, and the plank in the said wasteway, in seasons of high water : Therefore, it is considered by the court, that the defendant may have the opportunity to prosecute his suit at law to ascertain and protect his just and legal rights acquired under the power of his said contract of 1852, and the deed made and executed in pursuance of the same.

Therefore, our decree is in form and substance, as follows, viz :

BLLKNAP, SS.—SUPREME JUDICIAL COURT,                    }
*December Term, 1863.*
*Second Judicial District.*                    }

*The Winnipisseogee Lake Cotton and Woolen Manufacturing Company* v. *John L. Perley.*

This cause having been heretofore heard and argued by counsel, at this term, which is continued by adjournment to the 17th day of March A. D. 1864, upon consideration thereof, it is ordered and decreed, as follows, to wit :

The deed aforesaid of the said John L. Perley to the said Winnipisseogee Lake Cotton and Woolen Manufacturing Company, dated September 26th, 1853, should be, and the same is hereby reformed, so that the said deed shall grant and convey to the said company and their successors, and assigns, forever, the right to flow any lands which the said Perley owned on the said 26th day of September, 1853, and which may or might be flowed or affected by said company maintaining their dam at Union Bridge fifteen inches higher than the permanent part of said dam, as it existed on the 30th day of August, 1852 ; provided, that said company shall not keep the water higher than said point, fifteen inches higher than said dam, whenever they can keep it down to the same, by removing the flash boards from their dam, and by opening their wasteway, which shall be enlarged to the width of sixty feet.

The deed aforesaid, thus reformed, shall take and have effect for all purposes, as if it had been originally made as now reformed.

The signers of this said deed, and all claiming under them, are hereby perpetually enjoined not to set up or prosecute any claim against the plaintiffs, their successors, or assigns, inconsistent with the rights established by this decree.

The temporary injunction issued in this cause against the defendant's prosecuting his suit at law is hereby dissolved.

SAMUEL D. BELL,
*Chief Justice.*